**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **KEVIN JOSEPH KELLY, et al.,** | |
| *Plaintiffs*, | Case No.  2:19-cv-01706-JDW |
| v. | |
| **REALPAGE, INC. d/b/a On-Site, et al.,** | |
| *Defendants.* | |

## <u>MEMORANDUM</u>

Now more than ever, it is always true that "somebody's watching me. And I have no privacy." As the song says, one of the concerns is, "Who's watching? I don't know anymore!"[1] The Plaintiffs in this case, Kevin Joseph Kelly and Karriem Bey, want to know who's watching them. They think that Congress requires credit reporting agencies ("CRAs") to tell them. And they claim that Defendant RealPage Inc. and its subsidiary RP On-Site LLC fail that mandate because they do not disclose to consumers the vendors that they use to gather information about those consumers. They propose to represent two classes of people who they claim RealPage has deprived of that information.

Plaintiffs have evidence to satisfy many of the requirements for the classes that they propose to represent. But several individual inquiries preclude certification here. Most notably, the Court cannot determine who is a member of either proposed class without first reviewing RealPage's file about each class member to see if the file

---

[1] Rockwell, *Somebody's Watching Me*, on Somebody's Watching Me (Motown 1984).

includes public records that RealPage obtained from a vendor. In addition, the Court cannot certify what Plaintiffs refer to as the "All Requests Class" because it would require an inquiry as to whether class members requested information from RealPage. Plaintiffs' proposed classes also require an inquiry into whether each class member sought a particular report or a full file disclosure from RealPage. Because these individual inquiries will predominate over the common issues in this case, the Court will deny Plaintiffs' class certification motion.

## I.   FACTUAL BACKGROUND

### A.   RealPage Provides Disclosures To Consumers

RealPage operates tenant screening businesses, including RP On-Site LLC, which operates under the brand name "On-Site." When a landlord requests a report from RealPage, RealPage provides a screening report, which is a type of "consumer report" under the FCRA. *See* 15 U.S.C. § 1681a(d). Landlords and property managers use the tenant screening reports to determine whether they should approve or decline prospective tenant's lease application. RealPage creates these reports by obtaining public record information about issues such as criminal records and evictions from private vendors, such as LexisNexis and Hygenics. It then assembles that information and sells it to landlords and property managers.

Between September 2017 and November 2019, consumers could obtain information from RealPage in various ways. RealPage's customers (landlords, rental agents, property managers, etc.) could have RealPage send a link to a screening report to the consumer applicant at the same time RealPage sent the report to the customer. The consumer could then log onto RealPage's system and review the

report. Consumers could also visit RealPage's website and fill out a form requesting a file or screening report. On the form, a consumer had to provide the name of the rental housing community where he had submitted his application. The form generated an email, and RealPage maintained an email inbox that fielded website requests. Between September 2017 and November 2019, RealPage received 16,659 such requests. When RealPage fulfilled those requests during the relevant time frame, it sent consumers their entire file, not just a particular screening report. The "file" consists of "all of the information on that consumer" that RealPage has, regardless of how it stores the information. 15 U.S.C. § 1681a(g).

For certain customers, RealPage maintained a database called a "Lease Notebook" that contained a notation if a consumer or customer contacted RealPage and RealPage sent a Rental Report to the consumer as a result. RealPage's system reflects 2,543 "Lease Notebook" notations for the period between September 2017 and November 2019.

Regardless of how consumers made their requests or the words that they used, between September 2017 and November 2019, RealPage sent every consumer the same document. That document was not just the screening report that RealPage sent to a customer. Instead, it was RealPage's complete file on the customer. If the file contained public records that RealPage obtained from a vendor, the file did not disclose the vendor(s) from which RealPage obtained those records. Overall, between September 2017 and November 2019, RealPage sent over 2.2 million file disclosures to consumers.

### B.      Plaintiffs' Requests To RealPage

On November 5, 2018, RealPage sold to the St. James apartment building in Philadelphia a rental report about Mr. Kelly. That report contained incorrect information, including that Mr. Kelly had two DUI convictions and a record of an outdated vehicle inspection tag that the report described as a misdemeanor conviction rather than a non-criminal summary offense. The St. James initially denied his application, but it changed its mind three days later. Mr. Kelly received a copy of his Rental Report from the St. James. Then, on November 7 and 8, 2018, he requested his file from RealPage through the online portal and in phone calls. On December 20, 2018, Mr. Kelly requested his "consumer file" from RealPage in a written request. (ECF No. 53-3 at 117-120.) Mr. Kelly received three reports from RealPage, and none of them disclosed that Hygenics was the vendor that provided RealPage with information about Mr. Kelly.

On November 28, 2018, Mr. Bey applied for an apartment at the Woodbridge Apartment Complex in La Mesa, California. That apartment complex ordered a Rental Report about him from RealPage. RealPage's Rental Report mistakenly stated that a Civil Action for Possession was filed against Mr. Bey in Cook County, Illinois. It also listed an erroneous eviction filing. LexisNexis provided those public records to RealPage. Mr. Bey requested a copy of his Rental Report from RealPage via a phone call. The file that RealPage sent him did not identify the third-party vendor source for the public records RealPage attributed to him.

4

**C.**     **Procedural History**

Plaintiffs filed this action in April 2019. In their Complaint, they claim that when RealPage failed to disclose the vendor source information for the public records RealPage attributed to them, it violated the FCRA. They assert a class-wide claim for violation of Section 1681g(a)(2). They each also assert individual claims for violations of Sectin 1681e(b) and Section 1681i. On July 10, 2020, Plaintiffs filed this motion certify the following class and sub-class:

> <u>All Requests Class</u>
> For the period beginning September 26, 2017 through November 30, 2019, all natural persons with an address in the United States and its Territories who had a Rental Report sent or caused to be sent to them by RealPage, Inc. through its On-Site operation which did not include the name of the private vendor source(s) from which public record information in the file was obtained.
>
> <u>Direct Requests Class</u>
> For the period beginning September 26, 2017 through November 30, 2019, all natural persons with an address in the United States and its Territories who had a Rental Report sent or caused to be sent to them by RealPage, Inc. through its On-Site operation which did not include the name of the private vendor source(s) from which public record information in the file was obtained, following a documented direct request by the consumer to RealPage Inc. and/or RP On-Site LLC.

(ECF No. 44-1 at 2.)

RealPage contests class certification on multiple grounds. (*See* ECF No. 53-1.) But its central argument is that the Court will have to conduct individualized inquiries to determine whether putative class members made requests for disclosures and, if so, the nature of their requests. (*Id.*) The Court considers this and other arguments below.

5

## II.    LEGAL STANDARD

Class action lawsuits are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 US 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 US 682, 700-01 (1979)). "Accordingly, the party seeking class certifications bears the burden of affirmatively demonstrating by a preponderance of the evidence that all the necessary requirements" have been fulfilled. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015) (citation omitted). Rule 23 of the Federal Rules of Civil Procedure outlines the requirements for class certification.

Under the Rule, a plaintiff must satisfy all four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183 (3d Cir. 2001). Rule 23(a) requires a showing of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. *See* Fed. R. Civ. P. 23(a). If these four requirements are satisfied, a plaintiff must show that at least one subsection of Rule 23(b) is met. In this case, Plaintiffs seek certification pursuant to Rule 23(b)(3). Rule 23(b)(3) contains two explicit requirements: predominance and superiority. *See Carrerra v. Bayer Corp.*, 727 F.3d 300, 305 (3d Cir. 2013).

In addition, class actions entail two preliminary inquiries: that the class is ascertainable and that the plaintiffs have provided a proper class definition. *Byrd*, 784 F.3d at 163-66. A proper class definition "must include (1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues or defenses

to be treated on a class basis." *Wachtel v. Guardian Life Ins. Co.,* 453 F.3d 179, 187 (3d Cir. 2006).

A court evaluating a motion for class certification must not do so "casually." *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 132 (E.D. Pa. 2015). Instead, a court "is obligated to probe behind the pleadings when necessary and conduct a 'rigorous analysis' in order to determine whether the Rule 23 certification requirements are satisfied." *Byrd*, 784 F.3d at 163 (citation omitted). Proper analysis under Rule 23 requires consideration of the parties' evidence and arguments, and the Court must make specific findings that each Rule 23 requirement is met. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 307. At times, this inquiry will require a court to examine issues that overlap, to some extent, with issues left for the final merits determination. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 318 (3d Cir. 2008). However, the Court should only engage in this overlapping analysis to the extent necessary to resolve the class certification motion, and no more. *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013).

## III.   ANALYSIS

### A.   Personal Jurisdiction

RealPage argues that, in light of the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 137 S.Ct. 1773 (2017), this Court does not have personal jurisdiction over claims of non-Pennsylvania putative class members. But *Bristol-Myers* did not involve a Rule 23 class action. In *Bristol-Myers*, more than 600 named plaintiffs, residents and nonresidents of California, instituted a mass tort action under California state law in California. The

Supreme Court held that California lacked specific jurisdiction over the nonresident plaintiffs' claims because the nonresidents were not prescribed, did not purchase, did not ingest, and were not injured by the drug in California. *Bristol*-Myers, 137 S.Ct. at 1781-83. Thus, the Court explained, there was no "connection between the forum and the specific claims at issue." *Id.* at 1781.

Although the Third Circuit has not considered whether *Bristol-Myers* applies to a Rule 23 class action, trial courts in this District, and at least one Circuit Court, have held that the "principles announced in *Bristol-Myers* do not apply to the case of a nationwide class action in federal court under a federal statute." *Mussat v. IQVIA, Inc.*, 953 F.3d 441, 443 (7th Cir. 2020); *see also Gress v. Freedom Mortg. Corp.*, 386 F. Supp.3d 455, 465 (MD Pa. 2019)(there are "differences between a mass tort action and Rule 23 class action."); *McIntyre v. RealPage, Inc.*, No. CV 18-3934, 2020 WL 5017612, at *17 (ED Pa. Aug. 25, 2020). This Court agrees that there are "distinct differences between a mass tort action and a Rule 23 class action." *Gress*, 386 F. Supp.3d at 465. For example, the federalism interests at issue in Bristol-Myers regarding states exceeding the bounds of their sovereignty are absent in federal court and under federal law, where the only relevant "sovereignty" is the United States. The Court concludes that it has personal jurisdiction over Real Page for claims of absent class members.

**B.    Standing**

A plaintiff has standing to invoke the jurisdiction of a federal court when he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

*Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1543 (2016), *as revised* (May 24, 2016) (quote omitted). The standing requirements are the same for an individual plaintiff and for a putative class representative. *Id.* at 1547 n.6. "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548. For an injury to be "particularized," it must "affect the plaintiff in a personal and individual way." *Id.* A concrete injury is one that is real, not abstract, but it does not have to be tangible. *See id.* at 1548-49. The "[i]njury-in-fact" element is not Mount Everest," and while it is not always "precisely defined," it is "very generous." *In re Horizon Healtcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 638-39 (3d Cir. 2017).

The "unlawful denial of access to information subject to disclosure" can constitute a concrete injury. *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 273-74 (3d Cir. 2016). When Congress imposes procedural requirements that protect the public at large, an affected person must show that a violation of that procedure caused him a concrete injury. But if "Congress has created a private duty owed personally to [a plaintiff] to protect *his* information, then the violation of the legal duty suffices for Article III injury in fact. *Spokeo*, 136 S. Ct. at 1554 (Thomas, J., concurring) (emphasis in original).

The FCRA requires that a consumer have access to all information in his file and the sources of that information. If a CRA like RealPage deprives the consumer of information about him in his file, then it causes the consumer a concrete injury, similar to the injury that Justice Thomas contemplated in his concurrence in *Spokeo*. The

Fourth Circuit's decision in *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337 (4th Cir. 2017), which RealPage cites, does not compel a different result. In that case, the plaintiff complained that he did not know what company he was dealing with because his credit report listed a predecessor company as the one with which he was delinquent. The error was not meaningful, though, just like an erroneous ZIP code would not be. *See Spokeo*, 136 S. Ct. at 1550. In contrast to *Dreher*, this is not a case about a minor, harmless mistake. It is a case about a total absence of one type of information. If the FCRA requires its disclosure to individual consumers, then its absence harms those consumers.

RealPage argues that Messrs. Reynolds and Bey do not have standing because they did not act on the information once they received it. That argument misses the point. The FCRA does not require anyone to act on information once they have it. They can choose to act or to stand pat. But to make that choice they have to have the information in the first place. If RealPage deprived them of required information, then they suffered an injury that gives them standing.

### C.    Elements Of Plaintiffs' Class Claim

Section 1681g(a) provides that "[e]very consumer reporting agency shall, upon request, . . . clearly and accurately disclose to the consumer: (1) All information in the consumer's file at the time of the request . . .; and (2) [t]he sources of the information . . . ." 15 U.S.C. § 1681g(a). A "file" is "all of the information on that consumer recorded and retained by a consumer reporting agency regardless of how the information is stored." 15 U.S.C. § 1681a(g). The statute does not define "request" or "source," and the parties dispute the meaning of both terms. The Court does not

10

need to resolve the parties' dispute about the meaning of "source," because that is the fundamental liability issue in this case. However, the parties' dispute about the meaning of "request" bears on class certification. And a "district court errs as a matter of law when it fails to resolve a genuine legal or factual dispute relevant to determining the requirements" for class certification. *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 270 (3d Cir. 2011).

"It is the cardinal canon of statutory interpretation that a court must begin with the statutory language." *In re Philadelphia Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010), *as amended* (May 7, 2010). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992)). To determine whether statutory language is ambiguous, the Court must "read the statute in its ordinary and natural sense." *Id.* (quote omitted). The "plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997); *see also Monzon v. De La Roca*, 900 F.3d 92, 102 (3d Cir. 2018). If the statutory language is not clear, then a court should turn to canons of statutory construction to discern Congress's intent. *See U.S. v. Cooper*, 396 F.3d 308, 310 (3d Cir. 2005).

These principles lead the Court to conclude that a consumer must make a direct request for the complete contents of his or her own file before Section 1681g(a) imposes obligations on a CRA. The statute requires CRAs to obtain identification from a consumer before disclosing the consumer's file to him, and it gives the consumer

the power to authorize disclosure of his file by various means. *See* 15 U.S.C. § 1681h. It also limits the number of people who can accompany a consumer when the consumer gets access to his file. *See id.* At the same time, other provisions of the FCRA limit the types of disclosures CRAs can make to third parties. *See, e.g.,* 15 U.S.C. §§ 1681b, 1681d. Read together, these provisions indicate that Section 1681g requires a request for a file disclosure come from a consumer, not from someone else.[2]

The statutory provisions also require the consumer to request his complete file. Under Section 1681g, a CRA must disclose a consumer's complete file. Section 1681b permits a consumer to direct the disclosure of his consumer report. *See* 15 U.S.C. § 1681b(a)(2). Section 1681d addresses a consumer's ability to obtain an investigative consumer report, which is a report on a consumer's character, reputation, personal characteristics, or mode of living based on personal interviews. *See* 15 U.S.C. §§ 1681d, 1681a(e) (definition). The FTC has also determined that a consumer's request for a file disclosure and the disclosure of a consumer report are different. *See In re Equifax Inc.*, No. 8954, 96 F.T.C. 844, at * 471 n.48 (F.T.C. 1980), *rev'd on other grounds sub nom. Equifax Inc. v. Fed. Trade Comm'n*, 678 F.2d 1047 (11th Cir. 1982). Read together, these statutory provisions demonstrate that there is a distinction between a request for a file and a request for a consumer report. Only a request for a file triggers a CRA's obligation under Section 1681g.

---

[2] While the Court agrees with RealPage's argument, it is troubled by one citation in RealPage's Opposition. RealPage cites *Loboon v. Equifax Info. Svcs., LLC*, No. 18-cv-1978, 2020 WL 610450, at *4-5 (E.D. Pa. 2020) as holding that "a plaintiff under 'Section 1681g must allege that the plaintiff requested a copy of his credit file disclosure . . . .'" (ECF No. 53 at 10.) But in the quoted language from *Laboon*, the court recited the defendant's argument. It did not adopt that argument. RealPage's suggestion to the contrary is misleading and inappropriate.

> ### D.     Class Certification
>
> #### 1.     Preliminary inquiries
>
> ##### a.     Class definition

"An order that certifies a class action must define the class and the class claims, issues, or defenses . . .." Fed. R. Civ. P. 23(c)(1)(B). That requires an order that includes "(1) a readily discernible, clear, and precise statement of the parameters defining the class or classes to be certified, and (2) a readily discernible, clear, and complete list of the claims, issues, or defenses to be treated on a class basis." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012). The two proposed classes satisfy this requirement. The All Requests Class and Direct Request Class define the parameters of who will be in the class as anyone who received (in the case of the All Requests Class) or requested and received (in the case of the Direct Request Class) a Rental Report that did not disclose the vendor source from which public record information in the file was obtained. Each class also defines the scope of the claim to be treated on a class-wide basis as the alleged violation of Section 1681g(a)(2). Those proposed definitions satisfy the requirement of a defined class.

RealPage complains that the class definitions are overbroad because they do not track the elements of a claim under Section 1681g(a)(2). In *Byrd*, the Third Circuit cautioned against injecting Rule 23 requirements into preliminary inquiries like class definition and ascertainability. *See Byrd*, 784 F.3d at 167-68. The court explained that if a class is overbroad, it raises issues of commonality and predominance, but it does not create a problem with a class definition or with the class's ascertainability. "Defining the class in terms of the legal injury is not the same as requiring the class to

be defined with reference to objective criteria." *Id.* at 167 (quote and cite omitted). Therefore, the Court concludes that, even if the class is overbroad, it satisfies the requirement of a discernible class.

### b.     Ascertainability

The ascertainability inquiry "is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria, and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd*, 784 F.3d at 163 (quote omitted). "The ascertainability inquiry is narrow." *Id.* at 165. It consists of nothing more than the two elements set forth above. *See id.* at 163. And it does not require a plaintiff to identify all class members, only to show that he can identify them. *See id.* Like all other requirements, the plaintiff must prove ascertainability by a preponderance of the evidence. *Marcus*, 687 F.3d at 592-93.

Plaintiffs' propose classes that are defined with reference to objective criteria— whether a class member received or requested and received a Rental Report that did not disclose source information. But they have not shown that there is an administratively feasible way to determine who falls within that class definition. Plaintiffs have shown that RealPage can identify individuals who received a file disclosure during the relevant period, but not everyone who received a file disclosure will be part of the proposed classes. The definition of each proposed class limits membership to consumers who received a file disclosure that "did not include the name of the private vendor source(s) from which public record information in the file was obtained." (ECF No. 44-1 at 2.) That limit means that, for each potential class

member, someone would have to review his file and determine whether the file contained public record information in the first place. If it did not, then there would not have been anything to disclose, and that consumer would not be part of the class. A review of each individual file is, of course, not administratively feasible. So while the class can be measured objectively, there is no administratively feasible way to conduct that measurement.

### 2. Rule 23(a) factors

#### a. Numerosity

To satisfy the numerosity requirement, a plaintiff must show that the proposed class is so numerous that joinder of all members is impracticable. This generally requires more than 40 class members. *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249-50 (3d Cir. 2016). Plaintiffs have shown that the All Request Class has hundreds-of-thousands, if not millions, of members, and the Direct Request Class has tens-of-thousands of members. Joinder is not practicable for either class. Real Page does not argue otherwise.

#### b. Commonality

The commonality requirement requires a plaintiff to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality does not require the perfect identity of questions of law or fact among all class members. *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). Instead, Plaintiffs must demonstrate that their claims "depend upon a common contention," the resolution of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 US 338, 350 (2011). There

can be legal and factual differences among the class members, as long as the defendant subjected them all to the same harmful conduct. Ultimately, the commonality bar is not a high one. *See Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013).

Plaintiffs have cleared this low bar. For each of their proposed classes, there are at least two common legal questions, whether: (a) RealPage's disclosure of a consumer file that did not include the vendors that provided information violated Section 1681g(a)(2); and (b) whether RealPage acted willfully. Although RealPage purports to contest this factor, its arguments really address whether individual issues or this common issue will predominate in any class action. The Court therefore addresses RealPage's arguments in analyzing the predominance factor.

### c.    Typicality

The typicality factor aids a court in determining whether "maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interest of the class members will be fairly and adequately protected in their absence." *Marcus*, 687 F.3d at 594 (citation omitted). A plaintiff can meet this requirement when his claims "arise from the same alleged wrongful conduct." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004). To determine whether a named plaintiff is so different as to prevent a finding of typicality, a court must address three distinct concerns: "(1) the claims of the class representative must be the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many

16

members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class." *Id.* at 598. The Third Circuit has set a "low threshold" for typicality, such that even "relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016) (quotes omitted).

Plaintiffs satisfy the typicality requirement. They received from RealPage a copy of their file that did not include a disclosure of the vendors that supplied information for their screening reports. That is the same issue that affects all members of each putative class. RealPage claims that they are atypical because they lack standing, but the Court has dispensed with that argument. RealPage also argues that they are atypical because they did not act on the vendor source information once they received it. That might be a difference, but it is not enough of a difference to render Messrs. Reynolds and Bey atypical, particularly in a case where they seek statutory damages, not damages flowing from the harm that the non-disclosure caused.

### d.   Adequacy

The final 23(a) factor—adequacy—considers both the plaintiff's and counsel's adequacy to represent the class. "Whether adequacy has been satisfied 'depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class.'" *McDonough v. Toys R Us, Inc.*, 638 F. Supp. 2d 461, 477 (ED Pa. 2009) (quoting *New Directions Treatment Servs. v. City of Reading*, 490 F.3d

293, 313 (3d Cir. 2007)). "The second factor 'seeks to uncover conflicts of interest between named parties and the class they seek to represent.'" *Id.* (quoting *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004)).

Defendants do not challenge the adequacy of Messrs. Reynolds or Bey, and the Court sees nothing to call their adequacy into question. The Court also concludes that Plaintiffs' counsel is adequate. Plaintiffs' counsel have experience prosecuting class actions, including under the FCRA, and have tried class actions to verdict. Defendants contest the adequacy of Plaintiffs' counsel based on their supposed failure to convey settlement offers from a mediation session. Based on the record, this appears to be nothing more than a lapse in memory on the part of a named plaintiff, not some nefarious conduct on counsel's part.

### 3.    Rule 23(b)(3) factors

#### a.    Predominance

Predominance requires the Court to find "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "focuses on whether essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence." *Taha v. Cty. of Bucks*, 862 F.3d 292, 308–09 (3d Cir. 2017). "To assess whether predominance is met at the class certification stage, a district court must determine whether the essential elements of the claims brought by the putative class are 'capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018).

At least three issues requiring individual inquiry predominate and make class certification improper.

*First*, both classes would require an individual inquiry to determine whether a consumer's file contained a public record and whether RealPage used a vendor to obtain that record. If not, then consumers whose files did not contain a public record would not have suffered an injury and have no viable claim against RealPage. RealPage makes this point in its Opposition (ECF No. 53 at 16.) Plaintiffs do not respond in their Reply. They do not offer any evidence to suggest that every file contains public records, even though it is their burden to establish predominance. And, there are certainly many consumers who have no criminal record or eviction proceedings in their backgrounds. That individual inquiry would predominate and dooms Plaintiffs' attempt to certify either class.

*Second*, for the All Requests Class, there is a question about whether a class member received their file from RealPage as a result of a direct request or for some other reason. Under Section 1681g, RealPage only had obligations to send a file disclosure to consumers who requested it. Many consumers received it without a request because a RealPage customer had activated a setting that automatically provided the disclosure to the consumer. That did not result from a "request," and so Section 1681g did not apply to those disclosures. Plaintiffs argue that, when consumers logged on to retrieve information that RealPage sent them, they made a request. But accepting something sent is different than requesting that it be sent. Only the latter satisfies the statute. This individual issue will predominate in the All Requests Class.

19

*Third*, for both the All Requests Class and the Direct Request Class, there is an individual issue about whether consumers wanted a complete file disclosure or just the disclosure of the consumer report that Real Page sent to a potential landlord. Only a request for a file disclosure would trigger Section 1681g. In addition, only consumers who wanted to receive their full file suffered the type of informational injury that confers standing. Thus, not just as a statutory matter, but as a Constitutional one, the Court would have to examine each class member to determine what he or she intended to request. These individual inquiries would predominate.

Plaintiffs argue that because class members received their complete file, they all suffered the same injury, meaning no individual inquiry is necessary. But that argument misunderstands the FCRA. A consumer can request a file disclosure or a consumer report. Each consumer is entitled to receive what he requests, and the statute provides different rules for different types of requests. It is possible that RealPage committed a different violation of the FCRA if it sent a consumer a complete file instead of the consumer report. *See In re Trans Union Corp. Privacy Litig.*, 211 F.R.D. 328, 336 (N.D. Ill. 2002) ("The FCRA limits the information that a consumer reporting agency may disclose, and it is the disclosure of information beyond that which is allowed which creates the violation."); N*unnally v. Equifax Info. Servs.,* LLC, 451 F.3d 768, 776 (11th Cir. 2006)("The [Plaintiffs] erroneously assume that more information is always better and disclosure of the consumer's complete file will better enable consumers to detect inaccuracies."); *Taylor v. Screening Reports, Inc.,* 294 F.R.D. 680, 686 (N.D. Ga. 2013)("The Court recognizes, however, that consumers may in fact want only a portion of their file. In particular, consumers who have been adversely affected

by a CRA's report may specifically request only the report that resulted in the adverse effect."). But the fact that some class members might have suffered a different injury under a different provision of the FCRA does not mean that they should participate in this case.

Plaintiffs also argue that there is no evidence that any class member requested anything other than the disclosure of his or her full file. Yet Mr. Kelly's first request to RealPage was only for the consumer report that RealPage provided to the St. James, not for his full file. Mr. Kelly's own experience guts that argument.

### b.    Superiority

The superiority analysis calls for a determination that a class action is the best method of achieving a "fair and efficient adjudication of the controversy." *Newton*, 259 F.3d at 186 (citing Fed. R. Civ. P. 23(b)(3)). This requires a "balance, in terms of fairness and efficiency, [of] merits of a class action against those of 'alternative available methods' of adjudication." *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996) (citing another source). In determining whether a class action is the superior method to adjudicate a controversy, courts should consider: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

The superiority analysis and the predominance inquiry are bound together. The trial of this case will require substantial individual inquiry, at least at a minimum

into the question of whether a particular class member's file contained a public record that might have then triggered an obligation to disclose the vendor that obtained that record for RealPage. A class action is not a superior method of resolving that issue because the individual nature of the inquiries would be time-consuming and inefficient.

## IV.    CONCLUSION

The individual issues discussed above will predominate and make this case inappropriate for class certification. Plaintiffs will have to pursue their claims individually, not on a class-wide basis. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
HON. JOSHUA D. WOLSON
United States District Judge

December 18, 2020